### Katherine L. N. WILLIS

v.

### UNITED STATES of America.

### Civ. No. T–76–379.

United States District Court,
D. Maryland.

March 1, 1978.

Jacques T. Schlenger, Harry D. Shapiro and Venable, Baetjer & Howard, Baltimore, Md., for plaintiff.

Gerard M. Martin, Asst. U. S. Atty., Baltimore, Md. and S. Martin Teel, Jr., Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

THOMSEN, Senior District Judge.

In this action, tried before the court without a jury, Plaintiff seeks recovery of gift taxes for the years 1971 and 1972 and interest thereon, assessed against her and paid by her to the Government. Plaintiff contends: (1) that gifts in trust of an income interest, made by her in December 1971 and January 1972, constitute a present interest qualifying for the $3,000 per donee exclusion under section 2503(b) of the 1954 Code; and (2) that the actuarial tables promulgated by the Internal Revenue Service in the Gift Tax Regulations are the appropriate method for valuing the income interests of the trust beneficiaries. The Government disputes both of these contentions, relying primarily on the fact that the property interests conveyed to the trustees were "unproductive," and that the trustees were given absolute discretion to retain or invest in unproductive assets.

The case has been submitted to the court on a stipulated record, containing many exhibits, and a statement of additional facts filed by defendant. Plaintiff does not dispute the truth of the facts contained in that statement, but objects to them on grounds of relevancy and materiality, arguing that where the trust language is clear, such evidence is not admissible. The court finds, however, that all but the last two paragraphs of the statement of additional facts are relevant, and that the portions of the statement, summarized below, are also material. Those material facts have been considered by the court.

*The Trust Agreement, the Assignments and the Gift Tax Returns*

On December 29, 1971, and on January 24, 1972, Plaintiff made gifts to the Trustees under a Trust Agreement executed by her on December 29, 1971, in which seventeen members of her family are the beneficiaries. Each gift consisted of one-half of her partnership interest in the Wimbledon Farms Partnership; each gift was reported on a Gift Tax Return and each gift was valued at $180,000. On each of the Gift Tax Returns, seventeen annual exclusions in the amount of $3,000 each were claimed by Plaintiff, which reduced the taxable gifts for each period. Plaintiff claimed the exclusions on the ground that each of the *income* interests granted to the trust beneficiaries had a value in excess of $3,000. Plaintiff concedes that the *remainder* interests are future interests which do not qualify for the annual exclusions. The income interests were valued by application of the tables contained in the Gift Tax Regulations, § 25.2512–9(f).

After the second gift was made, Plaintiff no longer had any financial interest in the Wimbledon Farms Partnership. The history of that partnership will be set out in the next section of this opinion.

The Trust Agreement under which the partnership interests were transferred provides that the trustees must divide and annually distribute all trust income among the seventeen beneficiaries named in the trust.[1] The trustees may also distribute, in their discretion, any trust property other than real estate which may come into their possession. If any portion of the Wimbledon Farms Partnership property is sold and the proceeds are distributed by the partnership, the trustees must distribute such principal payments within three years, in the same proportions as the beneficiaries are receiving income, unless such principal is reinvested in the real property owned by the partnership. The trust is to terminate upon the distribution of all the trust assets, or upon the youngest of the named beneficiaries attaining age 25, whichever first occurs. The youngest beneficiary was then eight years old. Thus, each beneficiary un-

---

1. The Trust Agreement allocated five shares to the Willis family unit, five shares to the Hewitt family unit and seven shares to the Monroe family unit. The Willis family unit consists of her son, his wife and their three children; the Hewitt and Monroe family units consist of her two daughters and their respective husbands and children.

der the trust has three interests: (1) a right to any income the trust may produce for the lesser of his or her life and eighteen years, or a shorter period than eighteen years if the youngest beneficiary dies before reaching 25 years of age; (2) a right to a share of the corpus either in the discretion of the trustees or upon the termination of the trust; and (3) a right to share equally with the other beneficiaries in the proceeds upon the sale of all or any portion of the real property, to the extent such proceeds are distributed by the partnership to the trustees as partners. Upon the death of any beneficiary, his or her share of income and/or corpus passes to his living lineal descendants, if any. There are no restrictions on the distribution of trust income to the beneficiaries; the agreement does not allow the trustees to distribute unequal amounts of income to different beneficiaries, or to withhold income. Any distributions of corpus by the trustees must be in equal amounts to the beneficiaries in the same proportion as the beneficiaries receive the trust income.

The powers of the trustees include the power to retain property granted to the trustees regardless of any lack of diversification, risk or non-productivity, the power to invest in any and all types of property, and the power to sell any assets held by them as trustees.

### The Wimbledon Farms Partnership

"Wimbledon Farms" consists of two pieces of real property, totaling 230 acres, located in Anne Arundel County, Maryland, near Annapolis. There are five houses on the property; one is occupied by the farm manager; four are rented, one of them to Plaintiff, Katherine L. N. Willis, who has lived there for many years.

The property has been operated in partnership since the early 1900's. Over the years there have been different partners, but before the death of E. Paul Norris in 1969 the partners had always been members of the Willis and Norris families who are descendants of an earlier owner of the property. In 1969 Plaintiff had a 50% interest in the property, and E. Paul Norris 50%. His interest passed to the trustees under his will. On December 29, 1971, after Plaintiff executed the Trust Agreement, summarized above, naming her son and her two sons-in-law as trustees, they became partners in her stead.

One of the two pieces of real estate which constitute Wimbledon Farms consists of 188.4 acres which is and has been farmed for many years. Since World War II various crops (such as grain, soybeans and tobacco) have been planted on the arable portion of this land. On one occasion the 188.4 acre tract was leased on a sharecrop arrangement, although other yearly attempts to secure such an arrangement have been unsuccessful. The Wimbledon Farms partnership owns equipment for planting, harvesting, and curing tobacco grown on the farm and for planting and harvesting other crops; no new equipment has been purchased since 1966, except a cultivator and tiller purchased in 1975 for $610. The partnership employs a farm manager, who resides on the farm, and such seasonal labor as is necessary for the harvesting of the crops.

The second piece of real estate consists of 48.4 acres of waterfront property fronting on South River and Harness Creek. On this 48.4 acres are two year-round residences: (a) buildings "# 101 and # 103" (a house and garage, which by the terms of the partnership agreement shall not be considered as a part of the partnership property, having been built by E. Paul Norris at his own expense) used as the Norris residence, for which no rent is paid; and (b) buildings "# 1 and # 3" (a house and garage) used as the Willis residence, for which Mrs. Willis pays rent. On the partnership property there are a tennis court, a swimming pool and, at Harness Creek, a boathouse and pier. Under the terms of the July 30, 1970, partnership agreement, the partners have joint use of the swimming point on South River, the boathouse and pier, the swimming pool and the tennis court.

Prior to the creation of the trust by Plaintiff on December 29, 1971, the partnership had filed federal income tax returns showing a loss for every year from 1963 to 1970.[2] The 1971 return showed a net income of $774.91. Each year from 1972 through 1976 showed a loss.[3]

Although the Wimbledon Farms Partnership has had an overall negative income history, the partnership's real property has appreciated in value because of its potential for development as a subdivision of residential properties.

Under the terms of the partnership agreement dated July 27, 1970, and extensions thereof, the profits and losses of the partnership are to be divided equally between the partners. The Norris trustees are given an option to purchase the portion of the farm property appurtenant to the buildings # 101 and # 103 at a price mutually agreeable to the partners or, failing agreement, pursuant to a price to be fixed by appraisers. Mrs. Willis is given an option to purchase buildings # 1 and # 3 and the property determined to be appurtenant thereto in the same manner. Sale of the other land or buildings constituting a part of Wimbledon Farms (except for any part of the 45 acres on the point) can be made to a third party (a) pursuant to agreement of the parties or (b) by first offering the land or buildings proposed to be sold to the partner opposing the sale, for purchase within 90 days at the bona fide offering price for such land or buildings. Upon termination of the partnership the assets are to be divided equally between the partners.

### References to the Farm in the Trust Agreement and Assignments

Each of the two assignments (December 29, 1971 and January 24, 1972) made by Plaintiff to the Trust created by her on December 29, 1971, recited the existence of the partnership and stated:

"WHEREAS, Assignor's children and their spouses have been responsible for several years for the operation of the farm, which is the business of the partnership, and are therefore entitled to an ownership interest, and

"WHEREAS, Assignor desires to stimulate the interest of her grandchildren in the family property (which constitutes the major asset of the Partnership) for which she has an especial affection."

The assignments stated that they were being made in consideration of these recitals.

Under the Trust Agreement, which was executed by Plaintiff on the date of the first assignment, the trustees were given broad general powers similar to those construed by this court in *Mercantile-Safe Deposit and Trust Co. v. United States*, 311 F.Supp. 670, 672 (D.Md.1970). After noting that such powers are commonly given to trustees by knowledgeable attorneys in Maryland and discussing the applicable Maryland and federal authorities, this court concluded that the income interests in the trusts involved in that case were present interests susceptible of valuation by the use of appropriate tables. This court stated, however, "The powers of a trustee are not exercised in vacuo, but in the context of a particular instrument." 311 F.Supp. at 674.

The Trust Agreement in the instant case provided that the net proceeds of any sales of the Wimbledon Farms real estate must be distributed within three years except for any portion of such net proceeds reinvested in the real estate or any entity holding the real estate. It added:

"For example, the current Wimbledon Farms Partnership Agreement provides certain options and rights of first refusal, and it is Grantor's intent that the net proceeds may be used to fund the exer-

---

**2.** In 1963 a loss of $9,701.17; in 1964 a loss of $3,159.72; in 1965 a loss of $574.44; in 1966 a loss of $3,949.33; in 1967 a loss of $5,007.84; in 1968 a loss of $4,337.46 (incorrect—the amount should have been $5,337.46); in 1969 a loss of $3,788.51; and in 1970 a loss of $7,503.56.

**3.** For 1972 (period ending 9/30/72) a loss of $3,302; 1973, a loss of $849; 1974, a loss of $775; 1975, a loss of $4,041; and 1976, a loss of $8,019.

cise of options and/or rights of that general nature pertaining to that realty."

The Trust Agreement also provided that certain "additional authority, powers, discretion, immunity and exoneration are hereby conferred upon the Trustees" and that "the Trustees are hereby authorized and empowered" inter alia:

"(a) To retain, in the Trustees' absolute discretion, and for such period as they shall deem advisable, any and all investments and other property coming into their hands under this Trust regardless of any lack of diversification, risk or non-productivity."

### Discussion

The questions which must be decided, under the facts of this case and the applicable law, are: whether the income interests given to the several donees constitute "present interests" qualifying for the $3,000 per donee exclusion; and whether the actuarial tables in § 25.2512–9(f) of the Gift Tax Regulations are an appropriate method for valuing those interests.

Both sides agree that the case is controlled by § 2503(b), IRC 1954, and § 25.-2503–3 of the Regulations, the relevant portions of which are set out in n.4 [4] in the margin.

■ The claimed exclusions relate only to the "income interests" of the several do-

nees; Plaintiff concedes that their right to receive shares of the corpus of the trust at some future time is a "future interest," the value of which may not be included in the claimed exclusions.

The Government does not dispute that if use of the actuarial tables is appropriate, each of the seventeen income interests, so valued, would be at least $3,000. The Government contends, however, that use of the actuarial tables is not appropriate under the applicable law and the facts of this case.

The controlling principles were stated in *Commissioner of Internal Revenue v. Disston*, 325 U.S. 442 at p. 449, 65 S.Ct. 1328 at p. 1331, 89 L.Ed. 1720 (1944) as follows:

"In the absence of some indication from the face of the trust or surrounding circumstances that a steady flow of some ascertainable portion of income to the minor would be required, there is no basis for a conclusion that there is a gift of anything other than for the future. The taxpayer claiming the exclusion must assume the burden of showing that the value of what he claims is other than a future interest. * * * "

In *Rosen v. C.I.R.*, 397 F.2d 245 (4 Cir. 1968), relied on by Plaintiff, each of two brothers transferred stock in Gulf American Land Corporation, of which they were in substantial control, to other members of the family as trustees, to pay any income therefrom to the donor's respective children

---

4. Sec. 2503(b), IRC 1954, provides:

"(b) *Exclusions from gifts.*—In computing taxable gifts for the calendar quarter, in the case of gifts (other than gifts of future interests in property) made to any person by the donor during the calendar year 1971 and subsequent calendar years, $3,000 of such gifts to such person less the aggregate of the amounts of such gifts to such person during all preceding calendar quarters of the calendar year shall not, for purposes of subsection (a), be included in the total amount of gifts made during such quarter. Where there has been a transfer to any person of a present interest in property, the possibility that such interest may be diminished by the exercise of a power shall be disregarded in applying this subsection, if no part of such interest will at any time pass to any other person."

Sec. 25.2503–3, Estate & Gift Tax Regs., provides in pertinent part:

"(a) No part of the value of a gift of a future interest may be excluded in determining the total amount of gifts made during the calendar quarter (calendar year in the case of gifts made before January 1, 1971). * * * 'Future interest' is a legal term, and includes reversions, remainders, and other interest or estates, whether vested or contingent, and whether or not supported by a particular interest or estate, which are limited to commence in use, possession, or enjoyment at some future date or time. * *. *

"(b) An unrestricted right to the immediate use, possession, or enjoyment of property or the income from property (such as a life estate or term certain) is a present interest in property. An exclusion is allowable with respect to a gift of such an interest (but not in excess of the value of the interest). * * * "

until the children reached specified ages, and then to distribute to such child his share of the corpus. Although stock of Gulf American was held by public shareholders, as well as the Rosens, the corporation had never paid a dividend on its common stock, but had retained all of its earnings for growth purposes. It was the failure of the corporation to pay dividends which created the problem presented in that case. The trustees were given the power to sell and reinvest the corpus of the trust (the donated stock) and the power to hold and invest in non-income producing property. Taxpayers valued the "income interests" by applying the actuarial factors taken from Table I, Column 3 of § 25.2512–9(f) of the IRS Gift Tax Regulations, the same section used by Plaintiff in the case at bar. The Fourth Circuit said:

" * * * Resort to the tables is justified in cases where valuation necessarily presents an element of speculation and where use of the tables is actuarially sound. * * *

"Use of the tables is prohibited to the taxpayer only in cases where such usage would result in an 'unrealistic and unreasonable' valuation. * * *

"Moreover, the trust instruments vested the trustees with the power to sell the donated shares and to reinvest the proceeds in income producing property. The Tax Court, erroneously we think, considered that the power was 'illusory' because the trustees were possessed of a present intention not to exercise it. True, the taxpayers have stipulated that: 'In the view of the Trustees the probability of future dividends in substantial amounts was sufficient to warrant retention of stock, notwithstanding the absence of a current income * * *. It was the specific belief of the Trustees that retention of Gulf American stock would furnish greater overall benefits to the beneficiaries than would an immediate sale and investment of the proceeds in then currently income-producing property.' It does not seem to us that a business decision not presently to change an investment voids the power to do so.

"It is important to note that it has not been suggested to us that the 'income interest' was valueless. Rather the government concedes that a *present* income interest (rather than a future interest, *C.I.R. v. Disston, supra*) was in fact donated. The concession seems to us near fatal. * * * " 397 F.2d at 247.

No such concession has been made by the Government in this case; the Government argues not only that the partnership interest conveyed to the trustees has not produced any income which could be distributed to the beneficiaries, but also that it is not likely to produce any such income so long as Plaintiff lives, in the light of her statements in the Assignment quoted above under the heading "references to the Farm in the Trust Agreement and Assignments."

The opinion in *Rosen* also stated:

" * * * Nor is the power to sell the Gulf American shares and reinvest in income producing property truly illusory in the sense that substantial impediments exist to its exercise, e. g., the nature of the underlying property causes conversion to be improbable. *Hamm v. C.I.R.*, 20 T.C. 1814 (1961), aff'd 325 F.2d 934 (8th Cir. 1963). On the contrary, Gulf American shares appear to be freely marketable—the stock is held publicly and is listed on the American Stock Exchange." Id. at 248.

Finally, the *Rosen* court stated the applicable test:

" * * * Absent extraordinary circumstances, and without regard to the amount of revenue produced, we think the taxpayers are entitled to resort to the actuary tables promulgated by the Commissioner himself. * * * " Id. at 248.

The question which must be decided by this court in this case is whether the "circumstances" are so "extraordinary" as to require the conclusion that use of the tables is impermissible.

There are material distinctions between this case and *Rosen*:

In *Rosen* the gifts consisted of stock of a corporation which was making money, al-

though not paying dividends. It was the "specific belief of the Trustees that retention of Gulf American stock would furnish greater overall benefits to the beneficiaries than would an immediate sale and investment of the proceeds in then currently income-producing property." 397 F.2d at 247. There is no similar evidence or stipulation in the case at bar, although it is agreed that the land is increasing in value.

■ The clear desire of the Plaintiff herein, expressed in the passage from the Assignment quoted above, was: "to stimulate the interest of her grandchildren in the family property (which constitutes the major asset of the Partnership) for which she has an especial affection." The trustees have respected Plaintiff's desire during the years since the gifts were made, and the reasonable inference is that they will continue to respect that desire, at least until Plaintiff dies or changes her mind.

An important distinction between this case and *Rosen* is the provision in the deed of trust executed by Plaintiff herein that if any portion of the Wimbledon Farms Partnership is sold and the proceeds are distributed by the partnership, the trustees to whom Plaintiff made the gifts *must* distribute such principal payments to the beneficiaries within three years unless such principal is reinvested in the real property owned by the partnership. This provision is notably different from the provisions in the *Rosen* trust instruments, which, as noted above, "vested the trustees with the power to sell the donated shares and to reinvest the proceeds in income producing property," and did not authorize distribution of the principal to the income beneficiaries until they attained specified ages. Moreover, as noted above, it was stipulated in *Rosen* that: "In the view of the Trustees the probability of future dividends in substantial amounts was sufficient to warrant retention of stock, notwithstanding the absence of a current income * * *. It was the specific belief of the Trustees that retention of Gulf American stock would furnish greater overall benefits to the beneficiaries than would an immediate sale and investment of the proceeds in then currently income-producing property." Those provisions are quite different from the provisions of the deed of trust in the case at bar, and no such belief has been proved in this case.

### Conclusion

The burden of proof on Plaintiff was stated by the Court in *Commissioner of Internal Revenue v. Disston*, 325 U.S. 442, 449, 65 S.Ct. 1328, 1331, 89 L.Ed. 1720, as follows:

" * * * In the absence of some indication from the face of the trust or surrounding circumstances that a steady flow of some ascertainable portion of income to the minor would be required, there is no basis for a conclusion that there is a gift of anything other than for the future. The taxpayer claiming the exclusion must assume the burden of showing that the value of what he claims is other than a future interest. * * * "

This court is mindful of the statement in *Rosen*, quoted above, that: "Absent extraordinary circumstances, and without regard to the amount of revenue produced, we think the taxpayers are entitled to resort to the actuary tables promulgated by the Commissioner himself."

This court concludes, however, that the provisions of the Trust Agreement and Assignments and the surrounding circumstances found and discussed above, amount to such "extraordinary circumstances" as prevent taxpayer (Plaintiff) from resorting to the Tables to establish a value of the income interests.

Judgment will be entered in favor of defendant.